1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

11
12
13
14
15
16

CHRISTOPHER WEDDLE,

               Petitioner,

    vs.

M.D. BITER, Warden,

               Respondent.

) Case No.  CV 13-1349-DTB
)
)
)
)
) ORDER DENYING PETITION FOR
) WRIT OF HABEAS CORPUS AND
) DISMISSING ACTION WITH
) PREJUDICE
)
)
)
)

17

**PROCEEDINGS**

18
19
20
21
22
23
24

      On February 25, 2013, petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody ("Pet.") along with a supporting attachment ("Pet. Att.") herein.  In accordance with the Court's Order Requiring Response to Petition, and after two extensions of time, respondent filed an Answer to Petition for Writ of Habeas Corpus on June 12, 2013.  On August 13, 2013, after one extension of time, petitioner filed his Reply thereto.  The parties also consented to proceed for all purposes before the undersigned United States Magistrate Judge.

25
26

      Thus, this matter is now ready for decision.  For the reasons discussed hereafter, the Court denies the Petition and dismisses this action with prejudice.

27
  / / /

28
  / / /

1

# PROCEDURAL HISTORY

On June 25, 2010, a Los Angeles County Superior Court jury found petitioner guilty of one count of first degree murder and three counts of willful, deliberate, and premeditated attempted murder.[1]  The jury also found true various firearm allegations and that the crimes were committed for the benefit of, at the direction of, or in association with, a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members.  (3 Clerk's Transcript on Appeal ["CT"] 481-88; 8 Reporter's Transcript on Appeal ["RT"] 1437-44.)  On July 16, 2010, the trial court sentenced petitioner to three consecutive life terms plus an additional 125 years-to-life in state prison.  (3 CT 595-96; 8 RT 1496-99, 1513.)

Petitioner appealed his conviction and sentence to the California Court of Appeal raising, *inter alia*, a claim generally corresponding to the sole claim alleged in the Petition herein.  (Respondent's Notice of Lodging ["Lodgment"] No. 4.)  In an unpublished decision issued on February 1, 2012, the Court of Appeal affirmed the judgment.  (Lodgment No. 7.)  Petitioner's ensuing Petition for Review to the California Supreme Court raising a similar claim was summarily denied without comment or citation to authority on April 25, 2012.  (Lodgment Nos. 8, 9.)

Meanwhile, petitioner sought to collaterally attack his conviction, filing a habeas petition in the California Court of Appeal on May 12, 2011 (Lodgment No. 10), in which he raised an unrelated claim, which was denied on May 24, 2011. (Lodgment No. 11.)[2]

/ / /

---

[1]    Petitioner was tried with his co-defendants, Glenn Cox ("Cox") and Desmond Weddle ("Weddle"), but he was provided a separate jury.

[2]    It appears that petitioner also filed a habeas petition in the Los Angeles County Superior Court raising a similar unrelated claim, and which was also denied. (See Lodgment No. 10.)

2

**SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL**

Since petitioner is not challenging the sufficiency of the evidence to support his convictions, the following summary is taken from the "Factual and Procedural Background" section of the California Court of Appeal opinion (Lodgment No. 7 at 2-6) (emphasis in original):[3]

> **The Shootings.** [¶]  *On December 31, 2007 at approximately 5:00 p.m., Oscar R., his older brother Alfredo (footnote omitted) and two of their friends were walking through an alley behind Pine Avenue in Long Beach.  All four individuals were 15 to 17-year-old male Hispanics.  After exiting a building next to the alley, Desmond and one or more African-American males approached the four and asked "Where are you guys from?"  Interpreting the question to refer to gang affiliation, Oscar responded "Nowhere. I don't bang."  One of the African-American men then said they were from "Babies," meaning the "Baby Insane" gang, and lifted up his shirt to show that he had a revolver tucked in his waist area.  He also accused the four of being affiliated with "ESL" or "Chongos," references to the East Side Longos gang. At that point, the groups separated without further incident.  [¶] A few hours later, Oscar and Alfredo attended a New Year's Eve party*

---

[3]     The Court notes that Ninth Circuit cases have accorded the factual summary set forth in an opinion of a state court a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1). See Slovik v. Yates, 556 F.3d 747, 749 n.1 (9th Cir. 2009) (as amended);  Moses v. Payne, 555 F.3d 742, 746 n.1 (9th Cir. 2009) (as amended); Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir. 2008); Mejia v. Garcia, 534 F.3d 1036, 1039 n.1 (9th Cir. 2008).   Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.  Here, petitioner does not contest the California Court of Appeal's summary of the underlying facts, nor has he attempted to overcome the presumption of correctness accorded to it.  Tilcock, 538 F.3d at 1141.

*at the Rosales home on Pine Avenue in Long Beach.  The Rosales family included siblings Jose, attempted murder victim Francisco and Veronica, then ages 21, 20 and 17, respectively.  The approximately 60 party guests included non-gang affiliated family, friends and coworkers, though some coworkers invited other guests who the Rosales family did not know.  Among the guests were murder victim Jonathan Fernandez and attempted murder victims Jessica Lopez and Savannah Malcolm. [¶] While he was at the party, Alfredo saw five or six African-American men walking around in a courtyard area near the Rosales home.  He recognized Desmond and another man from the alley confrontation.  He left the party approximately 10 minutes before midnight to wish his mother a happy new year.  While at his mother's home nearby, he heard gunshots.  [¶]  Francisco also saw three African-American men in the courtyard area at approximately 11:00 p.m.  He recognized Desmond and observed that he was wearing a red sweater.  Cox was wearing a gray sweater and the third individual was wearing a black or blue sweater and a black or blue bandana which covered the lower half of his face.  [¶]  Shortly before Alfredo left the party, Veronica returned home with her boyfriend who drove her and two others through the alley.  She saw three African-American men standing in the alley; at that point they were wearing bandanas covering part of their faces and one man lifted his shirt to reveal a gun.  Veronica's boyfriend sped quickly out of the alley, parked in front of the house and went into the party.  She saw the three men looking over the fence periodically to observe the party.  [¶]  Kurtland Livingston lived in an upstairs apartment next to the Rosales home. (Footnote omitted.)  A few minutes before midnight, [petitioner and his co-defendants] knocked on his front door, but he did not let them in.  [¶]  Just before midnight, Oscar saw*

4

*Desmond again, crossing the street toward the party. As Oscar turned
to go back inside the house, he heard at least four gunshots. Jose heard
three to five gunshots. When the shots were fired, the party guests
screamed and ran in different directions. When Veronica looked in the
direction of the shots, she saw the same three individuals who had been
in the alley, and then saw Fernandez and Lopez fall to the floor. [¶]
Immediately after the first gunshot, Francisco saw Desmond's clasped
hands move downward. He also saw murder victim Fernandez fall to
the ground. Though Veronica and Jose saw Cox (or a man in a gray
shirt) shoot four or five shots randomly, Francisco and Malcolm
observed the man wearing black or blue fire several shots. [¶] When
he returned to the party, Alfredo saw a man and woman lying on the
ground, bleeding. Malcolm had been shot in the arm and ran to hide
inside the Rosales garage. Francisco chased and tackled Cox after he
stopped shooting, but let Cox go when he was shot in the back by the
man in black or blue. [¶] Long Beach police officers arrived at the
scene just a few minutes after the shootings. They investigated for
several hours, but were unable to recover any ballistic evidence from
the area. The absence of casings led officers to believe that the weapon
used was a revolver. [¶] On January 4, 2008, Long Beach Police
Officer Abel Morales arrested Desmond and retrieved a hat bearing
gang writing on it. Two days later, Long Beach Detective Gary
Hodgson arrested [petitioner] and recovered cell phone "SIM" and
memory cards which contained photographic images that had been
created on New Year's Eve, including a photograph of Cox in the
possession of a revolver. Subsequently, in a March 2008 police
interview, Livingston identified Desmond as the person he saw shooting
during the New Year's Eve party at the Rosales home. [¶] **Gang***

5

1      ***Evidence.***  *[¶]  Gang expert Long Beach Police Department Homicide*
2      *Detective Todd Johnson was familiar with the Insane gang, as well as*
3      *its cliques, one of which was the Baby Insane gang.  The gang's primary*
4      *activities were murder, attempted murder, possession of weapons,*
5      *terrorist threats and possession of narcotics for sale.  Baby Insane*
6      *members were virtually all African-American males and their primary*
7      *rivals were Hispanic individuals, regardless of whether they were gang*
8      *members.  He opined that [petitioner] was a Baby Insane gang member*
9      *on the basis of his self-admission and his association with other Baby*
10     *Insane gang members.  He also opined that Desmond was a Baby Insane*
11     *gang member on the basis of his self-admission and the gang tattoos*
12     *that appeared following the shootings.  Finally, he opined that Cox was*
13     *a Baby Insane gang member on the basis of his previous contact with*
14     *Cox where he admitted his gang membership.  Detective Johnson found*
15     *it significant that Cox's tattoos included a Cleveland Indian (the "I"*
16     *serving as a symbol for "Insane"); the initials "B.I.G." and "23"*
17     *standing for Baby Insane gang, 23rd Street; the initials "L" and "K"*
18     *standing for Longo (or Hispanic) killer; and the name "'Norman Cox,"*
19     *Cox's brother who was killed by East Side Longo gang members in*
20     *November 2006.  [¶]  When posed with a hypothetical that mirrored the*
21     *evidence of the events that preceded the shootings, Detective Johnson*
22     *opined that the shootings were committed for the benefit of and in*
23     *association with the Baby Insane gang.  [¶]  **Evidence Offered Only***
24     ***Against [Petitioner].***  *[¶]  After expressly waiving his constitutional*
25     *rights, [petitioner] answered questions during a recorded interview*
26     *with police officers on January 5, 2008.  Initially, [petitioner] stated*
27     *that he was unaware of the shootings.  He then described the*
28     *confrontation with Oscar, Alfredo and their friends during New Year's*

6

*Eve afternoon.  Later that day, he, Desmond and Cox smoked some marijuana and drank some alcohol.  Much later that evening, the three walked though the alley toward Livingston's apartment when a car drove by toward a party and they took turns firing Cox's gun in the air. [Petitioner] was wearing a black shirt.  They reloaded the gun and then returned to the alley where [petitioner] grabbed the gun from Cox to keep him from shooting at a car with two Hispanic female passengers. Cox retrieved the gun and at that point [petitioner] put a blue bandana over his face because he knew Cox was going to do something stupid. Cox then fired shots over a wall into a party and, as he ran away, threw the gun to [petitioner] who fired shots to scare the individual who began chasing them.  Cox told [petitioner] that he shot a "dude" and a girl in the head.  The three disposed of the gun the next day.  [¶]* **Defense Case.** *[¶]  [Petitioner] did not offer any defense evidence.  On Cox's behalf, his father testified that he had been married to a Hispanic woman who helped raise Cox and that he had not heard Cox make negative references about Hispanic individuals.  He conceded that Cox's brother was killed by Hispanic gang members.  On behalf of Desmond, Baby Insane gang member Darnell Harris denied his earlier statements to the police about Desmond being at his house on New Year's Eve around the time of the shootings and about seeing Desmond running right after shots had been fired.  He further denied knowing [petitioner and his co-defendants].*

### PETITIONER'S CLAIM HEREIN

The trial court violated petitioner's Sixth Amendment right to an impartial jury by failing to grant a mistrial after several members of petitioner's jury overheard or

/ / /

7

1    were the subject of inappropriate comments by court spectators.  (Pet. at 5; Pet. Att.
2    at 1-10.)

3

4                               **STANDARD OF REVIEW**

5         The standard of review applicable to petitioner's claims herein is set forth in
6    28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty
7    Act of 1996 (the "AEDPA"):

8              An application for a writ of habeas corpus on behalf of a person
9         in custody pursuant to the judgment of a State court shall not be granted
10        with respect to any claim that was adjudicated on the merits in State
11        court proceedings unless the adjudication of the claim–(1) resulted in a
12        decision that was contrary to, or involved an unreasonable application
13        of, clearly established Federal law, as determined by the Supreme Court
14        of the United States; or (2) resulted in a decision that was based on an
15        unreasonable determination of the facts in light of the evidence
16        presented in the State court proceedings.

17

18        Under the AEDPA, the "clearly established Federal law" that controls federal
19   habeas review of state court decisions consists of holdings (as opposed to dicta) of
20   Supreme Court decisions "as of the time of the relevant state-court decision."
21   Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); see
22   also Greene v. Fisher, 565 U.S. –, 132 S. Ct. 38, 44, 181 L. Ed. 2d 336 (2011); Carey
23   v. Musladin, 549 U.S. 70, 74, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006).

24        Although a particular state court decision may be "contrary to" and "an
25   unreasonable application of" controlling Supreme Court law, the two phrases have
26   distinct meanings.  Williams, 529 U.S. at 391, 413.  A state court decision is
27   "contrary to" clearly established federal law if the decision either applies a rule that
28   contradicts the governing Supreme Court law, or reaches a result that differs from the

                                          8

1  result the Supreme Court reached on "materially indistinguishable" facts. Brown v.
2  Payton, 544 U.S. 133, 141, 125 S. Ct. 1432, 161 L. Ed. 2d 334 (2005); Early v.
3  Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam);
4  Williams, 529 U.S. at 405-06.  When a state court decision adjudicating a claim is
5  contrary to controlling Supreme Court law, the reviewing federal habeas court is
6  "unconstrained by § 2254(d)(1)."  Williams, 529 U.S. at 406.  However, the state
7  court need not cite or even be aware of the controlling Supreme Court cases, "so long
8  as neither the reasoning nor the result of the state-court decision contradicts them."
9  Packer, 537 U.S. at 8.

10       State court decisions that are not "contrary to" Supreme Court law may only
11  be set aside on federal habeas review "if they are not merely erroneous, but 'an
12  unreasonable application' of clearly established federal law, or are based on 'an
13  unreasonable determination of the facts.'"  Packer, 537 U.S. at 11 (citing 28 U.S.C.
14  § 2254(d) and adding emphasis).  A state court decision that correctly identified the
15  governing legal rule may be rejected if it unreasonably applied the rule to the facts
16  of a particular case. See Williams, 529 U.S. at 406-10, 413 (e.g., the rejected decision
17  may state Strickland rule correctly but apply it unreasonably); Woodford v. Visciotti,
18  537 U.S. 19, 24-27, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002) (per curiam).  However,
19  to obtain federal habeas relief for such an "unreasonable application," a petitioner
20  must show that the state court's application of Supreme Court law was "objectively
21  unreasonable."  Visciotti, 537 U.S. at 24-27; Williams, 529 U.S. at 413.  An
22  "unreasonable application" is different from an erroneous or incorrect one.  See
23  Williams, 529 U.S. at 409-11; see also Visciotti, 537 U.S. at 25; Bell v. Cone, 535
24  U.S. 685, 699, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002).  Moreover, as the Supreme
25  Court recently held in Cullen v. Pinholster, 563 U.S. –, 131 S. Ct. 1388, 1398, 179
26  L. Ed. 2d 557 (2011), review of state court decisions under § 2254(d)(1) "is limited
27  to the record that was before the state court that adjudicated the claim on the merits."
28  / / /

1    In <u>Harrington v. Richter</u>, 562 U.S. –, 131 S. Ct. 770, 784-85, 178 L. Ed. 2d 624

2    (2011), the Supreme Court held that a summary denial order will be presumed to be

3    a merits determination "in the absence of any indication or state-law procedural

4    principles to the contrary." The Supreme Court further held that the AEDPA standard

5    of review applies to such summary denial orders.  <u>See</u> <u>id.</u> at 784 ("Where a state

6    court's decision is unaccompanied by an explanation, the habeas petitioner's burden

7    still must be met by showing there was no reasonable basis for the state court to deny

8    relief.  This is so whether or not the state court reveals which of the elements in a

9    multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a

10   component of one, has been adjudicated.").

11

12                              **DISCUSSION**

13    Petitioner contends that the trial court violated his Sixth Amendment right to

14   an impartial jury by failing to grant a mistrial, or at a minimum, dismiss additional

15   jurors, after several members of the jury overheard or were subject to inappropriate

16   comments by court spectators.  (Pet. at 5; Pet. Att. at 1, 5-6.)  Petitioner maintains

17   that, given the number of jurors who heard negative comments by members of the

18   public during his trial, petitioner's likelihood of receiving a fair trial by an impartial

19   jury was "vastly decreased." (Pet. Att. at 7.)  Additionally, the misconduct occurred

20   immediately after the prosecutor's opening statement and before any evidence had

21   been presented.  Thus, before hearing any evidence, petitioner argues that his jury

22   included a juror who was scared and intimidated by a member of the audience, a juror

23   who witnessed the intimidation, a juror who was left with a negative impression of

24   petitioner because of petitioner's associates in the audience, a juror who had reason

25   to believe the shootings were done in retaliation for another gang-related shooting,

26   and a juror who had reason to believe the prosecutor should be replaced.  (Pet. Att.

27   at 7-8.)  Although petitioner concedes that these jurors said that the information they

28   overheard would not affect their ability to decide the case based on the evidence,

almost half of the jury panel had been exposed to negative information about the case or petitioner.  (Pet. Att. at 8.)  According to petitioner, considering the number of affected jurors combined with the totality of the negative information conveyed, petitioner was left at a high risk of being tried by a biased jury depriving him of his Sixth Amendment right to a fair trial before an impartial jury.  (Id.)

I.    Relevant factual background

During petitioner's trial, following a recess after the prosecutor's opening statement, the trial court stated that "one of the people in the audience, [petitioner's] sister [Shakain], had an inappropriate contact with a jury, said inappropriate things." (1 RT 123.)  Thereafter, the trial court asked Shakain to stand up, and stated, "I hear you used inappropriate language and talked to a juror.  You're not supposed to do that."  The woman responded, "I wasn't talking to a juror."  (Id.)  The trial court excused the woman from the trial as well as the building for the remainder of the trial. (1 RT 124-25.)  The bailiff reported that a juror had told him that "as the whole group stepped out, they were talking loud.  And [the juror] was just sitting there and he was looking and . . . they caught each other's eyes.  And she said something to the effect of, what are you looking at, my mouth?"  (1 RT 124.)  The bailiff went on to state "I don't know if [the juror] said something about mother fucker, but basically that's what it was.  And he said she was confrontational."  (Id.)  The bailiff also indicated that Shakain had been confrontational with him from the beginning.   (Id.) Petitioner's counsel requested that the jurors be brought in one-by-one, to clarify the issue, and indicated that he would probably be moving for a mistrial.  (Id.)  The trial court admonished the rest of petitioner's family not to say anything to any juror or anybody else, make facial expressions, signs, or anything, and cautioned them that they would be held in contempt of court if they did anything.  (1 RT 125.)

/ / /

/ / /

Thereafter, outside the presence of the other jurors, the trial court questioned Juror No. 11, the juror involved in the incident.  The trial court asked Juror No. 11 to explain what happened.  Juror No. 11 stated (1 RT 148):

> I didn't really hear them say anything.  They were speaking loud, and they were being very theatrical.  And I was sitting there just looking around, and one girl turned to me and said something about -- something about the lips, and I took it as I'm reading her lips.  And I was not.  So I looked the other way because she kept insisting that I was staring at her.

Upon further questioning, Juror No. 11 indicated that the confrontation scared him a little and that he was a "little intimidated."  (Id.)  The juror stated that the only person he talked to about the situation was another juror who asked if they were talking to him, to which he responded yes.  (1 RT 149.)  Petitioner's counsel then asked him whether he told the other juror that he felt intimidated, and Juror No. 11 said, "No."  (Id.)  Juror No. 11 stated that he did not know who the person was that had confronted him, and believed he could still be fair and impartial.  (1 RT 149-50.)

Thereafter, the trial court called Alternate Juror No. 2, who was the juror that spoke to Juror No. 11.  (1 RT 150.)  The juror stated that the member of the public had said some like, "Why are you staring in my face?" (1 RT 151.)  Alternate Juror No. 2 indicated that the comment did not intimidate him because it was not directed to him, but that he would have felt intimidated if it had been as "it was said in a hostile, anger manner . . . ."  (Id.)  Alternate Juror No. 2 assumed, based on common sense, that the woman who made the comment and the people she was with "had something to do with this trial."  (1 RT 152.)  The trial court instructed him not to speculate and Alternate Juror No. 2 admitted that he did not know who the identity of the people were for a fact.  (Id.)  The following exchange then took place (1 RT 152-54):

12

1   The Court:   Is anything about that that [sic] makes you feel like it would
2   affect your ability to be fair and impartial to both sides in this case -- all
3   the parties in this case?"

4   Alternate 2:  Yes.  Because I jumped to the conclusion that -- I'll be very
5   honest with you -- that they were somehow associated with the
6   defendant.  And if this was the kind of folks that he was associated with,
7   I question whether or not what kind of judgment he would have.

8   The Court:   Did you say any of that to any of the other jurors?  Did you
9   talk to any other juror about that feeling?

10  Alternate 2:  No.

11  The Court:   You know you're not supposed to.  Right?

12  Alternate 2:  Right.

13  The Court:   Do you think you can set that aside, not speculate, and
14  listen to the evidence and judge this case based on the evidence?

15  Alternate 2:  I think it would be tough to do this -- to do that because it
16  just created such a negative impression.

17  The Court:   You didn't have a conversation, but you feel like it created
18  such a negative impression that you couldn't set that aside?  You would
19  hold it against somebody in this case?  That's all I'm trying to find out.
20  Candid response.

21  Alternate 2:  I would hope to be able to set it aside.

22  The Court:   When you say "hope," that's still an ambiguous term.  [¶]
23  Can you put that aside and just judge this case based on the evidence?

24  Alternate 2:  I will try, yes.

25

26      The prosecutor and petitioner's counsel declined to make any further inquiries
27  of this juror.  (1 RT 154.)  Prior to excusing Alternate Juror No. 2, the juror was
28  instructed not to discuss the issue with any of the other jurors.  (Id.)

Petitioner's counsel then requested that the rest of the jury be interviewed. He argued that "it's clear" that Alternate Juror No. 2 was impacted and that the commotion, whether or not the jurors actually heard the words spoken, "clearly has impacted the jury as a whole." (1 RT 154.) Juror No. 7 was questioned next. Juror No. 7 stated that she heard a woman say, "Are you staring at me?" She did not know who the question was being directed at until Juror No. 11 said, "I guess I shouldn't be staring." (1 RT 155.) Juror No. 7 stated that she was not intimidated and she did not discuss the incident with anyone else. (1 RT 155-56.) She indicated that there may have been another juror sitting down reading nearby when the incident happened, but she did not know who she was. (1 RT 155.) Juror No. 7 indicated that the incident was not going to affect her ability to listen to the evidence and she could be fair to all parties. (1 RT 156.)

At that point, the trial court stated that the rest of the panel would be called in one-by-one. (1 RT 156.) Juror No. 2 was called next. Upon being asked by the trial court whether he or she overheard anything being said by someone leaving the courtroom, the juror stated that he or she thought there were some young ladies talking in the hallway, but the juror did not recall what they were talking about. (Id.) Juror No. 2 indicated that he or she did not hear anything that might affect their ability to listen to the evidence or be fair. (1 RT 156-57.) Juror No. 12 and then Juror No. 4 were the next to be called. Both indicated that they did not hear anything. (1 RT 157.) Juror No. 6, who was called next, had heard someone talking to some of the lawyers and saying that they should get the prosecutor changed "or something" because of a conflict of interest from another case "or something." (1 RT 158.) Juror No. 6 stated that nothing he heard would affect his ability to listen to the evidence in the case. (Id.) Juror No. 8 was then called, and stated that he or she had heard "something about he doesn't hate Mexicans, and the prosecutor shouldn't be involved in the case." (1 RT 159.) The juror did not know for sure who the person was or what side they were associated with. (Id.) Juror No. 8 stated that the comment would

14

not affect his or her ability to listen to the evidence and be fair to the parties. (Id.) Juror No. 9 did not hear anything and was dismissed. (1 RT 160.) Juror No. 3 was then called. This juror did not hear anything specific about the case. This juror heard what sounded like family members or someone talking about family issues and relatives. Juror No. 3 stated he or she did not think these comments would affect his or her ability to be fair and impartial. (1 RT 160-61.) Juror No. 5 was called next and indicated that he thought he overheard the mother of one of the defendants, who seemed to be upset that she could not testify because she was on probation or parole. (1 RT 162.) Juror No. 5 stated that he was not sure who she was, but thought that the comments would affect his ability to sit and listen to the evidence and be fair to both sides because Juror No. 5 wanted to hear her testify. (1 RT 162-63.) After the trial court explained that not all witnesses need to be called and that it was concerned that the juror was saying this because he would like to get off this jury, Juror No. 5 responded: "I'm not happy to be on this jury, if that's the question, but I will do my duty if that's what it takes. But you posed the question to me, your Honor, so I answered it honestly." (1 RT 164.) Juror No. 5 confirmed that he did not think he could set his feelings aside and listen to the evidence. (1 RT 164-65.)

Thereafter, the remaining alternate jurors were called. Alternate Juror Nos. 2 through 4 all stated that they did not hear anything. (1 RT 166-67.) Juror Nos. 1 and 10 also stated that they did not hear anything. (1 RT 167-68.) Juror No. 6 was then recalled and wanted to add that the person he overheard said she thought the prosecutor was going to try the case as retaliation for another gang murder, but did not think that would affect his ability to be fair and impartial. (1 RT 169.) The trial court instructed the juror to disregard the statement, which the juror confirmed he could do. (1 RT 169-70.)

After the jurors were questioned, petitioner's counsel moved for a mistrial. Petitioner's counsel argued that a number of jurors were impacted, and other issues such as possible prior homicides and bias on the part of the District Attorney's Office

15

were introduced. (1 RT 170.) Petitioner's counsel also expressed concern that Juror No. 6 was discussing retaliation for another gang member and speculated that all the jurors were scared. (1 RT 172-73.) The prosecutor argued that a number of the things said were in reference to the audience being excluded from the courtroom, and had no bearing on the case and should not have any effect on the jurors' ability to be fair and impartial. (1 RT 171.) The prosecutor further suggested that if the trial court and counsel believed some jurors could not be fair and impartial, they could be replaced, but that a mistrial was not warranted. (1 RT 172.) The trial court stated that petitioner's counsel was "making an overgeneralization" that all of the jurors were fearful. (1 RT 173.) The trial court concluded that only Juror No. 5 was "tainted inappropriately." Juror No. 11 said he could be fair and disregard the comment. The prosecutor noted that Alternate Juror No. 2 expressed some reservations, but thought he could be fair. (1 RT 175-76.)

The trial court denied the motion for a mistrial. (1 RT 176.) Juror No. 5 was excused. (2 RT 190.) Following further discussion with counsel, the trial court instructed both juries as follows (1 RT 182):

> I would like, just so we're clear, to remind you, please don't speak to anybody who is not a bailiff or doesn't have a juror's badge on, and don't speak to anybody who has a juror badge on with either a yellow dot if you're a red juror or a red dot if you're a yellow juror. [¶] Please remember not to discuss this case among yourselves or with anyone else or to form or express any opinion thereon until the case is finally submitted to you. [¶] Judge this case only on the evidence you hear and you're not to speculate about things. We talked about that at the very beginning in voir dire.

After the jurors were excused, the trial court instructed the audience as follows: "You are ordered not to say anything, to speak in front of any juror about the case, or say

16

anything to any juror.  Don't approach any juror, make any gestures or threatening remarks to any juror.  If I find you violated that order, I will find you in contempt. We'll have a hearing and you'll be looking at going to jail." (1 RT 183.)

Thereafter, for unrelated reasons, Juror No. 7 was replaced by Alternate Juror No. 2.  (6 RT 1111, 1125.)

II.    The California Court of Appeal decision

The California Court of Appeal rejected petitioner's claim on direct appeal, in pertinent part, as follows (Lodgment No. 7 at 16-19 (emphasis in original)):[4]

> *The governing legal standards are well established: "An accused has a constitutional right to a trial by an impartial jury.  [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is "'capable and willing to decide the case solely on the evidence before it'" [citations]."  (In re Hamilton (1999) 20 Cal.4th 273, 293-294.)  Because evidence showing that a juror's internal thought processes reflect bias may not generally be used to attack a verdict, "where a verdict is attacked for juror taint, the focus is on whether there is any overt event or circumstance . . . which suggests a likelihood that one or more members of the jury were influenced by improper bias."  (Id. at p. 294, fn. omitted.)  [¶]  Juror misconduct may occur where an overt event directly violates actual or*

---

[4]    See Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); see also Johnson v. Williams, 568 U.S. –, 133 S. Ct. 1088, 1094 n.1, 185 L. Ed. 2d 105 (2013) (noting that the Ninth Circuit, consistent with Ylst, "look[ed] through" the California Supreme Court's summary denial of a petition for review and examined the Court of Appeal's opinion).

prospective jurors' duties and admonitions, such as when a juror consciously receives outside information, discusses the case with non jurors or conveys improper information to the other jurors.  (In re Hamilton, supra, 20 Cal.4th at p. 274.)  Where the event involves a claim of juror intimidation, "[a] sitting juror's involuntary exposure to events outside the trial evidence, even if not 'misconduct' in the pejorative sense, may require similar examination for probable prejudice.  Such situations may include attempts by nonjurors to tamper with the jury, as by bribery or intimidation.  [Citations.]"  (Id. at pp. 294-295; accord, People v. Harris (2008) 43 Cal.4th 1269, 1303.)  "[A] nonjuror's tampering conduct or communication with a sitting juror, usually raises a rebuttable 'presumption' of prejudice.  [Citations.]"  (In re Hamilton, supra, at p. 295.)  [¶]  We resolve the question whether an individual verdict must be overturned for jury misconduct or irregularity pursuant to an objective, substantial likelihood test.  (People v. Harris, supra, 43 Cal.4th at p. 1303.)  "Any presumption of prejudice is rebutted, and the·verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no substantial likelihood that one or more jurors were actually biased against the defendant."  (In re Hamilton, supra, 20 Cal.4th at p. 296.)  "We independently determine whether there was such a reasonable probability of prejudice.  [Citation.]"  (People v. Harris, supra, at pp. 1303-1304.)  In making this inquiry, our Supreme Court has cautioned:  "The standard is a pragmatic one, mindful of the 'day-to-day realities of courtroom life' [citation] and of society's strong competing interest in the stability of criminal verdicts [citations].  It is 'virtually impossible to shield jurors

18

*from every contact or influence that might theoretically affect their vote.' [Citation.] . . . . "If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias.' [Citation.]" (In re Hamilton, supra, at p. 296.) [¶] On the basis of the record, we conclude there is no substantial likelihood that the jurors were actually biased against [petitioner] as a result of Shakain's exchange with Juror No. 11. The trial court excused Juror No.5, the only juror to indicate that third-party comments rendered him unable to decide the case on the basis of the evidence. The vast majority of the jurors did not hear the exchange or know anything about it. Though Jurors Nos. 2, 3, 6 and 8 heard comments by the group of which Shakain was a part, they did not hear her make any hostile or intimidating comments. Jurors Nos. 1, 4, 9, 10 and 12 did not hear any exchange or learn about it from other jurors. [¶] During the trial court's individual inquiries of each juror, [footnote omitted] the two jurors who heard Shakain's statement – Juror No. 11 and Alternate Juror No. 2 (who replaced Juror No. 7) – expressly indicated that they could be fair and impartial notwithstanding the exchange. Juror No. 11 stated he believed he could remain a fair and impartial juror, and Alternate Juror No.2 responded "I will try, yes," to the court's inquiry "Can you put that [negative impression] aside and just judge this case based on the evidence?" Courts may properly rely on a juror's statement that his or her ability to deliberate impartially has not been affected by a threat or intimidation "to determine whether a juror can maintain his or her impartiality after an incident raising a suspicion of prejudice. [Citations.]" (People v. Harris, supra, 43 Cal.4th at p. 1304.) Moreover, Juror No. 11 and Alternate Juror No. 2 did not discuss the event with other jurors; nor did they even know it was*

19

*[petitioner's] sister who made the comment. Under these circumstances, [petitioner] has failed to show a substantial likelihood of actual bias. (See People v. Panah (2005) 35 Cal .4th 395, 480 ["spectator misconduct on the part of defendant's supporters who, intentionally or not, made themselves conspicuous to the jurors in a manner that some of the jurors [understandably] interpreted as intimidating" does not amount to juror misconduct that denied defendant an impartial jury]; In re Hamilton, supra, 20 Cal.4th at p. 306 [defendant's sister and her boyfriend's attempt to intimidate juror by parking in an alley behind juror's house and driving away when the juror appeared gave rise to no substantial likelihood of actual bias].) [¶] In sum, we conclude that the record, "'including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no substantial likelihood that one or more jurors were actually biased against the defendant'" on the basis of Shakain's conduct. (People v. Harris, supra, 43 Cal.4th at p. 1303.) The trial court properly denied [petitioner's] motion for a mistrial.*

III.   Applicable legal authority

A criminal defendant has a Sixth Amendment right to a "fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961); see also Duncan v. Louisiana, 391 U.S. 145, 149,  88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968); Mancuso v. Olivarez, 292 F.3d 939, 949 (9th Cir. 2002) (as amended).  "If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel."  United States v. Hendrix, 549 F.2d 1225, 1227 (9th Cir. 1977); Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en banc).

20

1    "One touchstone of a fair trial is an impartial trier of fact - 'a jury capable and
2    willing to decide the case solely on the evidence before it.'"  McDonough Power
3    Equip., Inc. v. Greenwood, 464 U.S. 548, 554, 104 S. Ct. 845, 78 L. Ed. 2d 663
4    (1984) (quoting Smith v. Phillips, 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78
5    (1982)); Fields v. Brown, 503 F.3d 755, 766 (9th Cir. 2007) (en banc).  As explained
6    by the Supreme Court in Remmer v. United States, 347 U.S. 227, 229, 74 S. Ct. 450,
7    98 L. Ed. 654 (1954):

8        In a criminal case, any private communication, contact, or tampering
9        directly or indirectly, with a juror during a trial about the matter pending
10       before the jury is, for obvious reasons, deemed presumptively
11       prejudicial, if not made in pursuance of known rules of the court and the
12       instructions and directions of the court made during the trial, with full
13       knowledge of the parties.

14

15   "However, this does not mean that all extraneous information is *per se* prejudicial;
16   certain extrinsic contact with witnesses, such as contact involved with 'passing
17   [jurors] in the hall,' may ultimately be found to be *de minimis* and not prejudicial."
18   Tong Xiong v. Felker, 681 F.3d 1067, 1076 (9th Cir. 2012), cert. denied, 133 S. Ct.
19   989 (2013) (citation omitted, alteration in original).  "[D]ue process does not require
20   a new trial every time a juror has been placed in a potentially compromising
21   situation."  Phillips, 455 U.S. at 217 ("it is virtually impossible to shield jurors from
22   every contact or influence that might theoretically affect their vote").  "Otherwise, a
23   defendant could force a new trial simply by arranging some sort of improper juror
24   interaction."  Gomez v. Swarthout, No. CV 11-5171-PA (JPR), 2012 WL 6761721,
25   at *14 (C.D. Cal. Nov. 9, 2012), Report and Recommendation adopted by 2013 WL
26   55642 (C.D. Cal. Jan. 3, 2013).  Due process only requires a jury capable and willing
27   / / /
28   / / /

1    to decide the case solely on the evidence before it and a trial judge ever watchful to

2    prevent prejudicial occurrences and to determine the effect of such occurrences when

3    they happen.  Id.

4         The remedy for allegations of jury misconduct or bias is a hearing at which the

5    trial court determines the circumstances of what transpired, the impact on the jurors,

6    and whether the contact was prejudicial.  See Remmer, 347 U.S. at 229-30; see also

7    Phillips, 455 U.S. at 216; see also id. at 223 (O'Connor, J., concurring) ("[W]here the

8    juror has not been accused of misconduct or has no actual stake in the outcome of the

9    trial, and thus has no significant incentive to shield his biases, a postconviction

10    hearing could adequately determine whether or not the juror was biased."); Dyer, 151

11    F.3d at 974 ("A court confronted with a colorable claim of juror bias must undertake

12    an investigation of the relevant facts and circumstances."); but see Tracey v.

13    Palmateer, 341 F.3d 1037, 1044 (9th Cir. 2003) ("Remmer and Smith do not stand for

14    the proposition that *any time* evidence of juror bias comes to light, due process

15    requires the trial court to question the jurors alleged to have bias." (emphasis in

16    original)).

17

18    IV.    Analysis

19         Here, the record reflects that the trial court conducted a hearing as required by

20    Remmer with the participation of both defense counsel and the prosecutor.  After

21    examining all of the jurors regarding whether anything they had seen or heard

22    affected their ability to be impartial, the trial court denied petitioner's motion for

23    mistrial, implicitly finding that the remaining jurors could impartially decide the case

24    based on the evidence presented, without bias.[5]  The trial court's findings are entitled

25    to a presumption of correctness.  See Dyer, 151 F.3d at 975 ("So long as the

26

27         [5]     As explained, Juror No. 5, the only juror whom the trial court concluded

28    was "tainted inappropriately," was excused.

1  fact-finding process is objective and reasonably explores the issues presented, the
2  state trial judge's findings based on that investigation are entitled to a presumption
3  of correctness."); see also Mancuso, 292 F.3d at 953.  Petitioner does not assert any
4  procedural unfairness or other illegality in the hearing conducted by the trial court.

5      Further, as the California Court of Appeal concluded, even if Shakain's
6  comment gave rise to a presumption of prejudice, that presumption was overcome.
7  This decision was neither contrary to, nor involved an unreasonable application of,
8  clearly established Supreme Court law.  Nothing suggests that any juror was biased
9  against petitioner or could not otherwise maintained their impartiality.  As explained,
10 when individually questioned by the trial court, each of the jurors, except Juror No.
11 5, who was excused, stated that they could be fair and impartial.  Juror No. 11, to
12 whom the comment was directed, stated that he believed he could be a fair and
13 impartial juror.  The only other jurors who overheard the comments were Juror No.
14 7 and Alternate Juror No. 2.  As to Juror No. 7, she was dismissed during trial for
15 unrelated reasons, when her son-in-law was involved in an automobile accident.  (6
16 RT 1111.)  Thus, this juror did not ultimately sit on the jury and deliberate.  See Ross
17 v. Oklahoma, 487 U.S. 81, 86, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988) ("Any claim
18 that the jury was not impartial . . . must focus . . . on the jurors who ultimately sat" on
19 the jury.).  With respect to Alternate Juror No. 2, upon the trial court's inquiry as to
20 whether he could put aside the incident and judge the case based on the evidence, he
21 confirmed that he would.  (1 RT 154 ("I will try, yes.").)  Additionally, as the Court
22 of Appeal correctly concluded, Juror No. 11 and Alternate Juror No. 2 stated that they
23 did not discuss the event with the other jurors and they did not know it was
24 petitioner's sister who made the comment.  (Lodgment No. 7 at 18.)  Moreover,
25 Shakain's isolated comment did not relate to the case.

26     With respect to the remaining jurors, none of them overheard Shakain's
27 comment to Juror No. 11 and there is nothing in the record indicating that these jurors
28 were biased or improperly influenced.  Juror Nos. 1 through 4, 9, 10, and 12, each

1   stated that they did not hear anything that would affect their ability to be fair and

2   impartial and petitioner has not presented any evidence to the contrary. (1 RT 156-

3   57, 160-61, 167-68.)   Juror Nos. 6 and 8 both indicated that they had overheard

4   conversations regarding the prosecutor and that she should not be involved in the

5   case.  Again, however, both jurors stated that they did not hear anything that would

6   affect their ability to listen to the evidence and be fair to the parties. (1 RT 158-59,

7   169.)

8          Additionally, after questioning each of the jurors individually, the trial court

9   instructed them not to speak to anyone connected with the case.  The jury also was

10  repeatedly instructed to decide the facts based on the evidence presented, and to

11  disregard anything that took place when the trial was not in session.  The jury was

12  instructed that they must not allow anything that happens outside of the courtroom

13  to affect their decisions and that they must disregard anything they saw or heard when

14  the court was not in session, even if it was done or said by one of the parties or

15  witnesses. (3 CT 444, 447.)  They were further instructed that they must decide what

16  the facts are in the case, based only on the evidence presented in the courtroom and

17  that they must not be influenced by bias, sympathy, prejudice, or public opinion.  (3

18  CT 444, 447.)  Jurors are presumed to have followed the instructions given to them,

19  see Weeks v. Angelone, 528 U.S. 225, 234, 120 S. Ct. 727,145 L. Ed. 2d. 727 (2000),

20  and there is no evidence in the record that the jury failed to do so.

21         Finally, given the substantial evidence against petitioner, including petitioner's

22  incriminating statements to police officers (see Supplemental Clerk's Transcript on

23  Appeal 18-24, 53-54; 5 RT 1002-03), the Court concludes that the comments did not

24  have a substantial and injurious effect or influence in determining the jury's verdict.

25  Cook v. LaMarque, 593 F.3d 810, 827 (9th Cir. 2010) (petitioner is only entitled to

26  habeas relief if the error had a "substantial and injurious effect or influence in

27  / / /

28  / / /

24

1  determining the jury's verdict" (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637,

2  113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993))).  As such, based on the foregoing,

3  petitioner is not entitled to habeas relief.

4

5                                   **ORDER**

6          For the foregoing reasons, IT IS THEREFORE ORDERED that Judgment be

7  entered denying the Petition and dismissing this action with prejudice.

8

9  DATED: February 18, 2014

10

11                              THE HONORABLE DAVID T. BRISTOW

12                              UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                      25